UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:19-cr-00171-LEW-14 |
| | ) | |
| OLIVIA CARR, | ) | |
| | ) | |
| Defendant | ) | |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

On September 10, 2019, a Grand Jury indicted Defendant Olivia Carr ("Defendant") with one count of conspiracy to distribute and to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846(C). Defendant now moves to suppress evidence, contending it was obtained by means of an unreasonable traffic stop and vehicle search and eventually an overbearing custodial scenario. Def.'s Mot. to Supp. (ECF No. 320). On April 12, 2021, the parties participated in a hearing on Defendant's Motion to Suppress. For reasons that follow, the motion is DENIED.

### BACKGROUND

On December 30, 2018, Defendant was driving a rented Chevrolet Impala on the interstate in Troy, Illinois. At approximately noon, Trooper Arvidson of the Illinois State Police pulled Defendant over for allegedly crossing the "fog line" while maneuvering around a curve to enter the interstate. Trooper Arvidson approached the passenger side window to speak with Defendant and her passenger, Zane Willhide, at which point Defendant handed Trooper Arvidson her Maine driver's license.

After Trooper Arvidson asked about the duo's travel plans, she asked Defendant to come to the police cruiser while she wrote a warning for the alleged infraction. Defendant and Mr. Willhide both objected to this request. Trooper Arvidson made it clear that she was giving a lawful order and Defendant must comply. Around this time, Trooper Arvidson approached the driver's side door to convince Defendant to exit the vehicle. At this point, due to the escalating nature of the situation, Trooper Arvidson requested additional units to the scene. While standing at the driver's side door, Trooper Arvidson observed a "glass pipe consistent with the type of pipe used to smoke narcotics" in the passenger side door. Trooper Arvidson reassured Defendant that in lieu of a ticket she was only going to receive a written warning.  Further easing Defendant's concerns, Trooper Arvidson told Defendant she could bring her cell phone to record the conversation in the cruiser. When Defendant approached the cruiser's passenger side door, she noticed a police canine in the rear of the car. While in the cruiser, Trooper Arvidson asked Defendant several questions. The dashboard camera's video does not have audio, so the tone of these questions is unknown. During this encounter, Defendant appears calm with occasional displays of teenage mannerisms.[1]

Approximately twenty-two minutes after Defendant was pulled over, Trooper Arvidson and another trooper approached the Impala and asked Mr. Willhide to step out. The troopers then led the canine around the rental car. Approximately twenty-six minutes into the stop, the canine alerted to the odor of narcotics. The troopers proceeded to search

---

[1] Trooper Arvidson testified that Defendant's mannerisms were suspicious. That may have been so, but given Arvidson's observation of the glass pipe she already had the necessary data to extend the stop to pursue drug-related inquiries.

the vehicle.   After they found an empty holster, Defendant was handcuffed. Shortly thereafter, the troopers found two loaded handguns, ammunition, nine grams of methamphetamine with a black straw in a clear plastic bag, multiple glass smoking pipes, 81.8 grams of Gabapentin capsules in an orange pill bottle, and a black notebook.

Due to the presence of multiple firearms and drugs within the car, Trooper Arvidson decided to relocate the stop to the Illinois State Police District 5 Headquarters for officer safety. Naturally, by this time, Defendant was subject to formal arrest based on probable cause to believe she was engaged in drug trafficking activity.

At approximately 1:30 p.m., following the arrival of a tow, the troopers left the scene and headed to the station. Once the Impala arrived at the police station the officers continued their search. They retrieved 229 grams of 30mg Oxycodone Hydrochloride tablets, a Ruger .380 semi-automatic handgun, 956 grams of methamphetamine in two plastic wrapped bundles, and a 9-gram plastic container with a white powder later determined to be methamphetamine.

Although Defendant had been subject to formal arrest for hours, she was not mirandized until approximately 4:34 p.m. In the fact statement set forth in her motion to suppress, Defendant represents that she was questioned before receiving the warning. However, during the hearing there was no suggestion that the Government obtained any incriminating statements it intends to rely on at trial. After receiving the warning, Defendant stated she understood her rights and was willing to answer questions by affixing her signature to the Illinois State Police Constitutional Rights and Waiver Form. Defendant answered a few questions and then asked for her attorney. What she may have said does

3

not appear to be of any consequence. Defendant claims, by this time, she was suffering great stress, anxiety, and withdrawal sickness.

## ANALYSIS

"On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." *United States v. Delgado-Pérez*, 867 F.3d 244, 250 (1st Cir. 2017) (quoting *United States v. Winston*, 444 F.3d 115, 123-24 (1st Cir. 2006)).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. When law enforcement officers stop an automobile and detain its occupants, they have effectuated a "seizure" of everyone in the vehicle, which necessarily implicates the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018); *United States v. Chhien*, 266 F.3d 1, 5 (1st Cir. 2001). However, initiation of a traffic stop will not violate the detained individuals' constitutional rights if the stop is supported by the officer's observation of a traffic violation, *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009), or "a reasonable and articulable suspicion of criminal activity." *Chhien*, 266 F.3d at 6 (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)).

After the traffic stop is initiated, the duration of the stop must conform to the law enforcement "mission," meaning the stop should endure only so long as is reasonable to address the traffic violation or suspected criminal conduct that justified the stop at its inception, including the ordinary inquiries associated with traffic stops in general, such as

driver identification and licensure, vehicle registration, and proof of insurance. *Clark*, 879 F.3d at 4. The officer may also request identification from passengers, where doing so does not prolong the stop unnecessarily. *Id*. And when in the course of these inquiries the officer formulates new suspicions based on the "emerging tableau" of information, the officer is permitted to "increase the scope of his investigation by degrees." *Chhien*, 266 F.3d at 6 (citing *Terry v. Ohio*, 392 U.S. 1, 10 (1968) (discussing law enforcement's need for "an escalating set of flexible responses")).

Reasonable suspicion of criminal activity requires "more than a naked hunch that a particular person may be engaged in some illicit activity," but yet "does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime." *Chhien*, 266 F.3d at 6; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'" (quoting *Terry*, 392 U.S. at 30)). The degree of reasonable suspicion necessary to initiate or prolong a traffic stop is "dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). This standard looks to the particular facts of the case and requires "broad-based consideration of all the attendant circumstances." *Chhien*, 266 F.3d at 6 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

When circumstances justify a traffic stop, they also justify an order that the occupants – both driver and any passengers – exit the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *United States*

*v. Tiru-Plaza*, 766 F.3d 111, 119 – 20 (1st Cir. 2014) (suggesting the justification is safety related, but focused on the legality of an ensuing pat-frisk).

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. IV. To ensure this right, *Miranda* warnings must be provided whenever a defendant is subject to "custodial interrogation." *State v. Preston*, 411 A.2d 402, 405 (Me. 1980). As stated by the Supreme Court, such warnings are "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere." *Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966). If *Miranda* warnings are not given prior to a custodial interrogation, any statements made by a defendant are inadmissible. *Preston*, 411 A.2d at 405.

An interrogation is considered "custodial" when, as logic would dictate, a defendant is "both 'in custody' and subjected to 'interrogation.'" *United States v. Jackson*, 544 F.3d 351, 356 (1st Cir. 2008). In this inquiry, courts take an objective look at the circumstances of the interrogation and if the overall circumstances would lead a reasonable individual to understand that his situation was "comparable to a formal arrest," then the encounter will likely rise to the level of "custodial" for purposes of the Fifth Amendment. *United States v. Murdock,* 699 F.3d 665, 669 (1st Cir. 2012) (quoting *United States v. Guerrier*, 669 F.3d 1, 6 (1st Cir.2011)); *see also Miranda*, 384 U.S. at 444 ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").

Defendant moves to suppress the following evidence as a result of the stop and subsequent alleged interrogation:

a) All evidence obtained during the subsequent search of the vehicle;
b) All statements made by Ms. Carr following the stop;
c) All statements made by any other occupant of the vehicle;
d) All recorded and other statements made by Ms. Carr while jailed following her arrest; and
e) Any evidence obtained as a result of a search or arrest carried out following a warrant, the application for which referenced evidence obtained as a result of the illegal stop, seizure and detention of Ms. Carr and the vehicle.

### STATEMENTS BY OTHERS

Defendant's request to suppress all statements made by other occupants of the vehicle requires little discussion. "[F]ifth amendment rights, like fourth amendment rights, are personal to the individual and may not be vicariously asserted." *United States v. McDowell*, 918 F.2d 1004, 1007 (1st Cir. 1990) (internal citations omitted). It is well established that Defendant cannot successfully suppress the statements of others. This part of her motion is therefore DENIED.

### THE STOP

Trooper Arvidson's stop of Defendant's vehicle was supported by the fact that Trooper Arvidson witnessed Defendant cross the fog line. Illinois state courts and the Seventh Circuit have both held that a law enforcement officer's observation of a vehicle crossing the fog line justifies a traffic stop. *United States v. Bentley*, 795 F.3d 630, 634 (7th Cir. 2015) (video of a car crossing the fog line, coupled with credible officer testimony provided constitutional basis for the traffic stop); *People v. Geier*, 559, 944 N.E.2d 793, 799 (2011) (same); *but see People v. Leyendecker*, 787 N.E.2d (Ill. App. Ct. 2003) (finding "momentary one-foot crossing of the fog line … on a hilly road with poor visibility would not cause a reasonable person to suspect that defendant was not driving 'as nearly as practicable' within her lane.").

7

The Government has convinced me that this case is sufficiently similar to *Bentley* where the "lanes were clearly marked on a well-lit highway" and the "weather was good with high visibility and little wind." *Bentley*, 795 F.3d 630, 634 (7th Cir. 2015). The Defense, on the other hand, has not convinced me that the facts here are more akin to those in *Leyendecker*. Namely, there is no evidence that the Defendant only momentarily crossed the fog line on a hilly road or that there was poor visibility on the day in question. It seems the conditions were ideal and there were no outside factors that would excuse the Defendant's wayward driving.

Trooper Arvidson is an experienced officer who presented as knowledgeable about the area in which the stop occurred. She testified that Defendant's passenger side tires crossed over the fog line while maneuvering around an interstate on-ramp. While she was not especially adroit at explaining the innerworkings of her WatchGuard system, she is a police officer, not an IT expert. She gave reasonable testimony about why she did not activate her dashcam prior to turning on her lights. While it may have been an ideal practice to manually activate the WatchGuard system when Trooper Arvidson observed Defendant cross the fog line, her explanation that it is not the standard practice is reasonable. The failure to immediately initiate the WatchGuard video system for a fog line violation on a busy highway network in Illinois does not undermine Trooper Arvidson's testimony that the lane violation, in fact, occurred. While we have become accustomed to video capturing every human interaction, the absence of video does not leave us hopeless in an epistemological ditch. I did not interpret Trooper Arvidson's testimony in a manner suggesting that she manufactured the basis for the stop. I credit her testimony as truthful.

Defense counsel separately argued that the location of the stop was not consistent with Trooper Arvidson's professed concern for safety, by which argument he sought to undermine her credibility. I do not find Trooper Arvidson's rationale for affecting the stop where she did to be unreasonable or indicative of an ulterior motive. Officers often choose among a host of imperfect locations to affect stops, and Trooper Arvidson chose a place with limited shoulder space but with decreased traffic speeds. Taken together, with no evidence directly rebutting her testimony, I find Trooper Arvidson's testimony satisfies the Government's constitutional burden to establish the constitutional validity of the stop. I find Trooper Arvidson had reasonable suspicion to make a traffic stop in the state of Illinois. Defendant's request to suppress any evidence on this basis is DENIED.

## In Cruiser Dialogue

Defendant objects to the admission of any statements she made after Trooper Arvidson brought her back to the squad car.  In each case, the court must consider "whether the facts of a specific case indicate a situation more akin to a routine traffic stop . . . or indicate that a suspect has been subjected to restraints comparable to those associated with a formal arrest." *United States v. Campbell*, 741 F.3d 251, 266 (1st Cir. 2013) (citation omitted). Although the Supreme Court has said that *Miranda* warnings are not required during routine traffic stops, it has never held that to be a categorical rule; therefore, a fact-intensive analysis is necessary.

 Here, Trooper Arvidson ordered Defendant—an out-of-state eighteen-year-old—out of her car and to join Trooper Arvidson in her police cruiser while Trooper Arvidson issued a written warning.  Police officers undoubtedly have the right to require an occupant

to exit their vehicle during a traffic stop. *See Mimms*, 434 U.S. at 111. Defendant argues that being ordered into the police cruiser for an "indeterminate length" of time transformed this *Terry* stop into something more. The First Circuit disagrees. While I understand the Defendant's decreased sense of personal liberty when entering a police cruiser, the First Circuit has said when a police officer asks a citizen to enter a police car in connection with the traffic stop, this alone does not "elevate the detention beyond a *Terry* stop." *United States v. Dunbar*, 553 F.3d 48, 56 (1st Cir. 2009) ("Though Dunbar was stopped based on a traffic violation, not on suspicion of some larger crime, we see no basis for concluding that the officer could not place Dunbar in his cruiser while he prepared the traffic citation.").

*Dunbar* goes on to say that routine questions about things such as the passengers' itinerary will not automatically transform a *Terry* stop into a custodial interrogation. *Id.* at 56. Trooper Arvidson testified that one reason to have a driver come back to the cruiser is to obtain basic information in the event running a license proves insufficient. As to the environment, Trooper Arvidson told Defendant that the passenger side door was unlocked and that she could—and in fact did—open the door if she needed to. The canine was secured in a caged area in the back-passenger compartment. The video from inside the police cruiser does not have audio but the testimony and video support the conclusion that Trooper Arvidson's questioning was nothing other than professionally pleasant. The video of Defendant's demeanor supports this conclusion. In short, there was nothing to suggest that having Defendant enter the police cruiser escalated this encounter beyond a typical traffic stop.

Furthermore, the facts would, in any event, justify a somewhat more protracted *Terry* seizure given that Trooper Arvidson observed paraphernalia when standing alongside the driver's side door of the rental car. Particularly given the ready availability of a police canine, it was reasonable for the stop to be extended by the emerging tableau, at least to enable a canine sniff of the vehicle's exterior.

Finally, based on the testimony, there is no evidence that the Trooper pursued or recovered any incriminating statements in the cruiser, which renders the inquiry largely academic in relation to the suppression of statements. Given this reality, the critical issue is whether the stop and emerging tableau justified the search of the vehicle. In that regard, the delay associated with waiting for backup was not extensive and was, in any event, reasonable given the Trooper's observation of paraphernalia.

### ROADSIDE VEHICLE SEARCH

To the extent Defendant challenges her detention beyond the delay associated with preliminary introductions and the visit to the cruiser pending the run of her license, the emerging tableau made the canine sniff search reasonable, as previously indicated, and once the canine – ominously named "Bane" – alerted to the presence of narcotics, the Troopers were entitled to "increase the scope of [the] investigation" accordingly. *Chhien*, 266 F.3d at 6 (citing *Terry*, 392 U.S. at 10). Simply stated, Trooper Arvidson saw and heard, by degrees, enough to initially suspect and then to have cause to believe that Defendant was engaged in unlawful drug activity. Observation of a glass methamphetamine pipe tucked in the passenger door followed by a canine alert provided

ample cause to trigger the automobile exception to the warrant requirement.[2] In other words, the emerging tableau of facts—in particular[3] the glass methamphetamine pipe and the reliable open-air canine sniff—provided Trooper Arvidson with probable cause to search the vehicle. *See United States v. Brown*, 500 F.3d 48, 75 (1st Cir. 2007).

### STATION HOUSE STATEMENTS

Defendant's final argument is that her station house statements were constitutionally involuntary, evidently based on her age and the combined impact of the day's events, which include the presence of a canine and a lengthy period of being handcuffed. A statement is only "involuntary" if a defendant's will was overborne, considering the totality of the circumstances surrounding the confession. *United States v. Dickerson*, 530 U.S. 433, 434 (2000). The voluntary nature of statements is determined by considering "the totality of the circumstances, including both the nature of the police activity and the defendant's situation." *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). Relevant considerations include the length and nature of the questioning, promises or threats made by investigators, any deprivation of the suspect's essential needs, and the defendant's personal circumstances—i.e. age, education, intelligence, mental condition, and prior experience with the criminal justice system. *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014); *see also United States v. Doody*, No. 1:19-CR-00134-LEW-7, 2020 WL 1466202, at *1 (D. Me. Mar. 26, 2020). Finally, the burden is on the Government to show,

---

[2] The "open-air search" of the Impala was brief.  By my calculation, Bane was out of the cruiser for a total of forty-eight seconds.  This type of canine once-over is not a Fourth Amendment search, so it does not need to be justified by probable cause. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

[3] Trooper Arvidson also testified about nervous behavior on Defendant's part and nonsensical statements about travel plans. That testimony has not proved necessary to my analysis.

by a preponderance of the evidence, that Defendant's statements were voluntary. *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990).

I have not reviewed any evidence that would reasonably suggest that circumstances were so overwhelming that Defendant's execution of the waiver form should be treated as a nullity for purposes of the Fifth Amendment. While the burden is on the Government, Defendant does not accuse the Government of coercive tactics besides being handcuffed and detained for what she claims to be a lengthy period. Defendant presents a vague and unspecific argument on this point.  Broad claims of "highly coercive [treatment] over a lengthy period of time" are not enough. Def.'s Mot. to Supp. at 14 (ECF No. 320). According to the Government, Defendant became emotional at one point during the interview, and subsequently invoked her right to counsel, but there is nothing in the record to suggest this was the result of anything besides her realization of the trouble she was in. The Government has demonstrated by a preponderance of the evidence that Defendant's statements were voluntary. *See United States v. Bezanson-Perkins*, 390 F.3d 34, 39-40 (1st Cir. 2004) (explaining several tactics that would constitute coercive tactics, none of which were in evidence here, including but not limited to: beating a confession out of a suspect, inducing intoxication, and disregarding a suspect's clear requests for an attorney) (internal citations omitted).

As it pertains to Defendant's statements at the District 5 Headquarters, Defendant's motion is DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 369) is DENIED.

**SO ORDERED.**

**Dated this 16th day of April, 2021.**

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE
